IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA     :
                                  :
            v.                 :         1:22CR26-1
                                  :
ANDREW ALLRED RODRIGUEZ    :


GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S
MOTION TO SUPPRESS

NOW COMES the United States, by and through Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, and responds to Rodriguez's Motion to Suppress as follows:

I.     PROCEDURAL POSTURE

A federal grand jury returned a two-count indictment, charging the defendant, Andrew Allred Rodriguez (Rodriguez or the defendant), with one count of possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A) and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i). *See* Docket Entry "Dkt." #1.

The defendant moved to suppress evidence obtained from a lawful stop and subsequent detention that occurred on May 17, 2021. Dkt. #17. Rodriguez contends that the investigative stop was without reasonable suspicion and the subsequent detention was unlawful.

As set forth in further detail below, the stop was justified at its inception and reasonable in its execution. Moreover, all ensuing searches comported with the Fourth Amendment; the defendant's motion should be denied.

## II.    STATEMENT OF FACTS

Though the charges in this case arise from a May 17, 2021, car stop, law enforcement was well aware of Rodriguez and his involvement in the narcotics trade long before the day of the stop.

In October of 2020, the Randolph County Sheriff's Office (RCSO) bought methamphetamine from a target, B.M. During the course of that buy, a Honda Civic registered to the defendant pulled up and supplied methamphetamine to B.M. so the purchase could be completed. In November of 2020, RCSO Detective Chriscoe interviewed B.M. B.M. stated he was purchasing methamphetamine from many individuals, and he knew one supplier of methamphetamine to be someone he called "Migo." B.M. told Detective Chriscoe that Migo drove a white Honda and a black Dodge truck. B.M. also identified a photograph of Andrew Allred Rodriguez as "Migo". A month later, on December 26, 2020, Rodriguez was arrested in South Carolina with a

2

kilogram of methamphetamine. In the course of the investigation, on March 23, 2021, RCSO obtained a state tracker warrant[1] and placed the tracker on Rodriguez's truck.

On April 5, 2021, RCSO conducted surveillance on Rodriguez as he drove his black Dodge Ram to an address on Calicutt Henley Road. RCSO had recently received a complaint that the resident on Calicutt Henley Road was selling methamphetamine. Rodriguez arrived at said residence and stayed only twenty minutes. Rodriguez then drove to the North Forest Apartments where he met with a man. Rodriguez then retrieved something from his truck and followed the man into an apartment. Rodriguez and the man then left that apartment and went separate ways. RCSO followed the man with whom Rodriguez met. RCSO saw that man get into a white Maxima that traveled to a Food Lion parking lot where he met with several individuals for a brief period of time which RCSO believed, based on training and experience, was indicative of drug sales.

On April 8, 2021, Detective Chriscoe from RCSO saw Rodriguez travel to 801 E. Park Avenue in Lexington where he stayed for 55 minutes. This was significant because Detective Chriscoe knew the residents of 801 E. Park Avenue[2] were under investigation by other law enforcement agencies for drug

---

[1] The tracker warrant was renewed on April 5, 2021.
[2] This was not Rodriguez's home address.

3

distribution. On April 21, 2021, Detective Chriscoe learned that during an interview with a confidential informant (CI), the CI said that his dealer, C.C. was selling large amounts of narcotics and C.C.'s source was a young Hispanic male.

On May 17, 2021, Rodriguez returned to the 801 E. Park Avenue target residence. He walked into the residence and in less than an hour, walked back out with a black duffel bag in his hand which he then placed in the back seat. Believing the duffel bag contained contraband given the prior knowledge learned during the investigation, a surveillance team was placed on the truck as it left E. Park Avenue.

Sgt. Soles was able to catch up to the truck and saw that it was following another car extremely closely in violation of N.C. Gen. Stat. §20-152(a). Sgt. Soles then initiated a traffic stop. The black truck pulled over to the right side of the road and parked. Sgt. Soles approached the black truck and confirmed that the black duffel bag was still in the back seat and that Rodriguez was the sole occupant of the car. Rodriguez tried to get his cell phone to record the interaction with law enforcement. Sgt. Soles asked Rodriguez to step out of the car however Rodriguez refused. After multiple requests, Sgt. Soles was about to place Rodriguez under arrest when he finally got out of the black truck. Rodriguez began arguing with Sgt. Soles front the start of the stop and refused

4

to sit in the patrol car. Instead, Rodriguez just stood by the patrol car's passenger side door.

As Sgt. Soles was talking to Rodriguez, he noticed that Rodriguez was breathing rapidly and that he had a rapid pulsating carotid artery. Rodriguez asked why so many patrol cars had arrived for "following too closely." As Sgt. Soles began to issue a citation, Rodriguez continued to protest and said he felt like he was "being attacked." When asked where he lived, Rodriguez paused and didn't respond at first. He then said, "uh on my driver's license?" He further stated that he didn't do anything wrong, and he used to be in the Marine Corps.

Due to the background information regarding the narcotics investigation as well as Rodriguez's erratic behavior during the traffic stop, Sgt. Soles called for a K9 unit to come to the scene. While talking with Rodriguez about the citation, Sgt. Soles also asked where Rodriguez was coming from and where he was traveling to. Rodriguez told Sgt. Soles he was traveling to see his sister in Concord and that he had come from his house. Sgt. Soles knew this answer was untruthful as Rodriguez had been seen leaving 801 E. Park Avenue just prior to the stop. Rodriguez became agitated and asked why the stop was taking so long. He further inquired if the officers were investigating something. When asked if everything in the truck belonged to him, Rodriguez refused to answer. During the exchange between Rodriguez and Sgt. Soles, the first K9 unit

5

responded[3]. Immediately as the dog came out of the car, Sgt. Soles noticed that something was wrong with the dog as he was not conducting a proper sniff as his handler had instructed. Noting this problem, Sgt. Soles spoke with Officer Perkins and learned that the dog was being sent back and would no longer be utilized because of continued issues put a call out for Sgt. Barber, a K9 handler and supervisor over the entire K9 program. Sgt. Barber and his K9, Rocky, arrived[4] shortly thereafter. Sgt. Barber and Rocky immediately began to walk around the truck. Rocky alerted to the odor of narcotics inside the truck within one minute. Sgt. Soles then conducted a probable cause search of the truck.

In the duffle bag was 1074 grams of suspected methamphetamine, two clear plastic bags containing a total weight of 113 grams of suspected cocaine, $41,350.00 in U.S. currency, a box of sandwich bags, two sets of digital scales, a Glock 42 .380 caliber handgun, and a Sig 9mm handgun.

III.   DISCUSSION

**A. Sgt. Soles had reasonable suspicion to stop the defendant for both an observed traffic violation and for investigation of drug distribution.**

The investigatory stop of Rodriguez's truck based on the officer's observance of a traffic violation and the information that he had regarding an ongoing drug investigation was proper and lawful.  The Fourth Amendment to

---

[3] Deputy Perkins arrived at 5:00 pm.
[4] Sgt. Barber arrived with the second K9 at 5:17 pm.

the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. An officer may briefly detain a person for investigative purposes when there is reasonable suspicion, based in articulable facts, that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of circumstances, including information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266 (2002); *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). Because the intrusion created by a brief investigative detention is minimal, the reasonable suspicion standard is not exacting.

Reasonable suspicion exists where an officer "point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation marks and citations omitted). In assessing reasonable suspicion, courts must "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). The reasonable suspicion standard is not an onerous one; "notably, [it] is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."

7

*United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

The Court analyzes the propriety of a traffic stop on two fronts. First, the Court analyzes whether the police officer's actions were justified at inception. Second, the Court analyzes whether the police officer's subsequent actions were reasonably related in scope to circumstances that justified the stop. *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citing *United States v. Rusher*, 966 F.2d 868,875 (4th Cir. 1992)).

Sgt. Soles initiated a traffic stop after observing a violation of North Carolina law, specifically N.C. Gen. Stat. §20-152(a), which prohibits vehicles from following too closely. This violation alone is sufficient to justify the stop. *See Branch*, 537 F.3d at 335 (observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop) (citing *Illinois v. Cabellas*, 543 U.S. 405, 407 (2005)).

Sgt. Soles however did not simply have reasonable suspicion for the traffic violation, he also had reasonable suspicion that narcotics offense(s) were occurring. Sgt Soles received this information from another officer involved in the larger drug distribution investigation that included the defendant. *United States v. Hensley*, 469 U.S. 221 (1985).

8

In *Hensley*, an informant provided the police with information that the defendant had participated in a recent robbery. *Id.* at 223. Based on the information from the informant, the police issued a wanted flyer to other police departments. *Id.* Twelve days after the robbery, officers in another precinct stopped Hensley based on the flyer. *Id.* In determining that the officers had reasonable suspicion to make the stop, the Court analyzed the underlying information in the flyer and determined that the information was sufficient to provide reasonable suspicion. *Id.* at 234. Thus, the stopping officers were justified in stopping Hensley, even though they did not have their own independent reason for doing so. *Id. See also United States v. Masssenburg*, 654 F.3d 480, 493 (4th Cir. 2011) ("The law seems clear that *so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause*, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts…Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.") (quoting *United States v Laughman*, 618 F. 2d 1067, 1072-73 (4th Cir. 1980) (original emphasis)).

9

Like in *Hensley*, Sgt. Soles received information from another officer that supplied reasonable suspicion for the stop. Sgt. Soles learned that multiple law enforcement agencies were investigating a drug distribution conspiracy that included the defendant as a source of supply. Indeed, several law enforcement agencies were involved in the weekslong drug investigation where Rodriguez was a suspect, and Rodriguez was the main target in Randolph County's portion of the investigation. Even if Sgt. Soles did not know all the particulars of the investigation, he was aware of its import and the "knowledge of the group" can be imputed to him to assess reasonable suspicion. *Masssenburg*, 654 F.3d at 493. During the weekslong drug investigation, Randolph County obtained a GPS tracking warrant for Rodriguez's car two months *prior* to the stop at issue. The tracking warrant was signed by a State Superior Court Judge who found probable cause, a higher standard than reasonable suspicion, to place the tracking warrant on Rodriguez's car. In addition, an informant identified Rodriguez as his narcotics supplier, and his car was seen at a controlled buy. As part of the officers' weeks' long surveillance, Rodriguez was also seen at the residence of a known ongoing drug investigation multiple times—including immediately prior to the traffic stop at issue.

Moreover, in addition to all the information known to law enforcement, Sgt. Soles also noticed the defendant's own behavior which further corroborated the reasonable suspicion he had from the ongoing investigation.

10

Rodriguez refused to obey commands, he was breathing rapidly, and Sgt. Soles could see a rapid, pulsating carotid artery. While nervousness alone is not necessarily a good indicator of criminal activity, nervousness and evasive behavior is relevant to the determination of reasonable suspicion. *United States v. Wardlow*, 528 U.S. 119, 124 (2000). Here, Rodriguez was not able to immediately answer where he lived and lied about where he had been coming from before he was stopped. Accordingly, under a totality of the circumstances, Sgt. Soles was justified in extending the stop to investigate the narcotics activity further.

## B. Sgt. Soles had reasonable suspicion to extend the stop under *Rodriguez* and *Bowman*.

Next, the defendant argues that because Sgt. Soles extended the stop and conducted a canine sniff after issuing the defendant a citation, *Rodriguez* requires suppression of the evidence. The defendant misunderstands the application of *Rodriguez* to the facts of the instant case. Here, Sgt. Soles had reasonable suspicion to extend the stop beyond the issuance of a traffic ticket. The Court should deny the motion.

A lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of issuing a warning ticket. *Illinois v. Caballes*, 543 U.S. 405, 407(2005). However, it is well established, "[a]n officer . . . may conduct certain unrelated checks during an otherwise

11

lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, *absent the reasonable suspicion* ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (emphasis added).

Thus, *Rodriguez* does not stand for the premise that all traffic stops must conclude with the issuance of the citation; rather, *Rodriguez* merely affirms that *absent* reasonable suspicion a stop must conclude when the purpose of the stop is complete. In this case, law enforcement had reasonable suspicion of criminal activity separate and apart from the traffic infraction, and thus the prolonged detention was justified and constitutional. Thus, Sgt. Soles' basis for stop of the defendant was two-fold; he observed a traffic violation, i.e., following too closely, *and* he had reasonable suspicion that ongoing criminal activity was occurring related to drug distribution. As such, even when Sgt. Soles concluded the necessary checks related to the citation, he continued to have reasonable suspicion to investigate the narcotics offense(s).

An instructive case on this very issue is *United States v. Jordan*. 952 F. 3d 160 (4th Cir. 2020). In that case, Jordan was the subject of a weeks long investigation by the federal Drug Enforcement Administration (DEA). *Id*. at 163. Jordan became known to authorities when another individual was arrested for drug distribution and named Jordan as a source of supply. *Id*. As a result, law enforcement obtained a warrant to track the location of Jordan's

Case 1:22-cr-00026-WO   Document 19   Filed 07/25/22   Page 12 of 19

phone and another to place a location-tracking device on Jordan's truck. *Id.* After federal agents who were conducting surveillance watched Jordan enter and depart several locations over a short period of time, sometimes entering with one package and leaving with another, DEA agents decided to conduct an investigatory stop. *Id.* Those agents called a local Charlotte-Mecklenburg Police Department (CMPD) Detective who had been assisting in the investigation and asked him to conduct a routine traffic stop[5]. *Id.*

The CMPD Detective conducted a traffic stop after he observed Jordan turn through a red light without stopping. *Id.* During the course of the stop, the CMPD Detective waited for 11 minutes for backup to arrive before he walked his drug detecting canine around the car. *Id.* at 164. The dog alerted and then Jordan admitted he had cocaine in his possession. *Id.* Jordan moved to suppress the evidence seized as a result of the extension of the traffic stop. *Id.* The District Court denied the motion and Jordan was convicted at trial.

The Fourth Circuit upheld the District Court's denial of Jordan's motion to suppress and found that the CMPD Detective came to his encounter with Jordan with ample reasonable suspicion of drug distribution which justified the full length of the stop. *Id.* at 165. Specifically, the court noted that the

---

[5] The DEA agents testified in court that they frequently request local officers to find a separate cause to pull over a suspect for traffic violations so as to lessen the danger to the public and keep the investigation covert. *Id.*

detective had reasonable suspicion of ongoing criminal activity, apart from Jordan's traffic violation. *Id.* at 166. Further, the detective had constructive knowledge of another dealer's identification of Jordan as his primary supplier, of previous warrants issued, based on probable cause, for the tracking of Jordan's cell phone and truck; and of Jordan's movements earlier that day, which another agent observed and believed, based on his knowledge and experience, were indicative of drug transactions. *Id.* Thus, considering the facts as a whole, and "mindful of the practical experience of officers who observe on a daily basis what transpires on the street", the detective had reasonable suspicion to suspect Jordan of drug trafficking at the inception of the stop. *Id.* at 167 (quoting *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018)).

The case before this Court is indistinguishable from *Jordan*. Like in *Jordan*, Rodriguez was a target in a weeks-long drug distribution investigation. Also like in *Jordan*, Rodriguez had been identified as a supplier or source of narcotics. Likewise, just as in *Jordan*, a state superior court judge had issued a warrant—based on probable cause—allowing officers to track Rodriguez's truck. And prior to the traffic stop at issue, Rodriguez's activities at a house known for drug activity—entering without a bag, staying a short while, and leaving with a duffle bag—indicated to officers, based on their knowledge and experience, drug trafficking activity. Applying the *Jordan*

14

court's analysis to the facts in the instant case, this Court should find that Sgt. Soles had ample evidence of ongoing criminal activity and thus the stop of Rodriguez, and the subsequent extension of the stop to investigate further, were justified and constitutional. *Cf. United States v. Bowman.* 884 F.3d 200 (4th Cir. 2018) (where trooper explicitly stated he did <u>not</u> rely on tip he received from DEA to form reasonable suspicion in traffic stop).

Nor does the extension of the stop for a second canine render the stop unconstitutional. It is well-settled that officers are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants. *United States v. Singh*, 363 F.3d 347,355 (4th Cir. 2004).

The use of a canine is simply a tool that officers use for investigative purposes. Therefore, use of a canine in a stop is akin to the use of a portable breathalyzer in a driving while impaired stop. If the officer has reasonable suspicion to stop the car for driving while impaired, and realizes their portable breathalyzer is malfunctioning; it would be in inherently reasonable for the officer to call for another unit to arrive with one that works; not to simply conclude the stop and allow the driver to continue on. Likewise, when Sgt. Soles realized the initial canine was not working, he rightfully called for a second canine. Because Sgt. Soles had sufficient reasonable suspicion to investigate the suspected narcotics activity, the extension of the stop by only

15

16 minutes in order to use a working canine was well within the constitutional bounds of the Fourth Amendment. *See United States v. Newland*, 246 Fed. Appx. 180, 190 (4th Cir. 2007) (where officer had reasonable suspicion of drug activity, extension of stop long enough to allow canine to arrive and confirm or deny officer's suspicion was reasonable); *see also United States v. Sharpe*, 470 U.S. 675, 687-88 (1985)(holding stop of a vehicle and subsequent twenty-minute investigatory detention was reasonable where authorities observed circumstances indicative of drug trafficking).

### C. The GPS Tracking Warrant was based on probable cause.

Finally, the defendant urges this Court to find that the state tracking warrant, signed by a superior court judge, was issued without probable cause. The underlying validity of GPS tracking warrant, however, has no bearing on the analysis of the reasonable suspicion officers had on May 17, 2021, to stop and investigate the defendant. However, even if such suspicion of the state superior court judge's determination is warranted, this Court should find that the warrant stated sufficient probable cause and/or officers were acting in good faith when they relied on it.

Even if this Court were to review the GPS tracker warrant, this Court should find the evidence contained within established probable cause and thus the GPS warrant was valid. The GPS tracker warrant contained information that Rodriguez was identified as a source or supplier of narcotics by another

16

drug dealer. A second drug dealer corroborated that the source of narcotics was a young Hispanic male. A car registered to Rodriguez was used to deliver narcotics in a controlled buy on at least one occasion. Moreover, Rodriguez was arrested with a kilogram of methamphetamine in South Carolina. Based on these facts, and others contained within the affidavit, the state court judge's determination that there was sufficient probable cause to issue a tracker warrant was proper.

Even *assuming arguendo*, that the state tracker warrant was not supported by probable cause, any evidence obtained from the warrant should not be suppressed unless officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting *United States v. Leon*, 468 U.S. 897, 926 (1984)). In other words, the good faith exception applies to the tracker warrant unless "a reasonably well-trained officer should have known that the search was illegal." *Loen*, 468 U. S. at 922 n. 23. *See also United States v. Cluchette*, 24 F.3d 577, 582 (4th Cir. 1995) (applying good faith exception to search warrant issued by state judge over telephone, declining to determine whether warrant was valid under state law).

Here, Detective B. Chriscoe obtained the initial GPS search warrant to place a tracker on the defendant's truck on March 23, 2021. That warrant was

17

signed by a state superior court judge. On April 21, 2021, the same state superior court judge signed a warrant allowing continued use and monitoring of the tracker for an additional thirty days. Even assuming the GPS tracker warrant was invalid, officers were acting in good faith when they relied on the issuance of not just one, but two tracker warrants to monitor the defendant.

IV.    CONCLUSION

In sum, officers had reasonable suspicion to conduct a stop of the defendant on May 17, 2021. Further, the continued detention was proper given the totality of the circumstances. Rodriguez's motion to suppress should be denied.

This the 25th day of July, 2022.

Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney

/s/ NICOLE R. DUPRE
Assistant United States Attorney
North Carolina State Bar No. 41214
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
Phone: (336) 333-5351

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Mireille P. Clough, Esq.

/s/ NICOLE R. DUPRE
Assistant United States Attorney
North Carolina State Bar No. 41214
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
Phone: (336) 333-5351